IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CRAIG BUNTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 11 C 3107 |
| v. | ) |
| | ) |
| CITY OF ZION, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Craig Bunton's First Amended Complaint (Dkt. No. 8) alleges that the City of Zion is liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, for creating a hostile work environment and wrongfully terminating him on the basis of race, black, and for retaliating against him because of his complaints about racial discrimination. Currently pending before the court is the City's motion for summary judgment on all counts. (Dkt. No. 33.) For the reasons explained below, that motion is granted.

BACKGROUND

Craig Bunton was hired as a police officer with the Zion Police Department on January 5, 2001. (Dkt. No. 35 ("Def.'s SMF") ¶ 1.) In or around 2008, one of Bunton's fellow police officers, David Gort, used the word "nigger" as he told a story in Bunton's presence about a person who walked up to some police officers who were beating a black person. (Dkt. No. 42 ("Pl.'s SMF") ¶ 17.) Gort related that the person said to the police officers, "[d]amn, ya'll beating that nigger's ass." (*Id.*) Gort also told a story in which a black individual approached a police officer who was working security at a carnival and asked him if "[y]ou all looking for a black guy to beat up?" (*Id.*

¶ 18.) The officer responded, "Yeah and you are the black guy we're going to beat up." (*Id.*) Bunton stated that Gort was telling the stories in a lighthearted tone to be funny.[1] (Pl.'s SMF ¶ 18.) Bunton testified that he complained about the incidents to Wayne Brooks, the Deputy Chief of Police, on April 7, 2008, although Brooks denied that Bunton did so. (*Id.* ¶¶ 19, 20.) Bunton testified that Brooks responded by stating "[w]ell, you don't want to create even more animosity by making this into a big deal, you know, filing a formal complaint, and so you know, it'd probably be best just to let it be." (*Id.* ¶ 20.)

While on patrol on November 7, 2009, Bunton deployed his taser against an individual whom he had stopped. The incident, which is caught on video from Bunton's squad car (*Id.* ¶ 42; *see also* Dkt. No. 35, Ex. I.), started with Bunton questioning an individual who he saw walking on the street instead of in the sidewalk. (Def.'s SMF ¶ 15.) While questioning the individual, Bunton saw a car pass playing its car stereo. (*Id.*) Bunton judged that the car was emitting excessive noise, and entered his squad car to give chase. (*Id.*) Bunton disregarded a stop sign and at times reached speeds between 59 and 68 m.p.h., enabling him to catch up to the car, which had stopped in an ally behind the house of the driver, Darrell Lynch. (*Id.*) As Bunton's car pulled up, Lynch exited his vehicle. (*Id.*) Bunton then told Lynch four times to get back in his vehicle, but Lynch did not comply and instead shut the car door. (Pl.'s SMF ¶ 42.) Lynch then took a stall step forward and said "Man, you better go somewhere, Dude." (*Id.*) Bunton continued to tell Lynch to get back in the car, but Lynch

---

[1] The City objects to the consideration of Gort's comments on the ground that they are hearsay. That objection is overruled because the stories are not offered for the truth of the matter asserted, but instead in an attempt to show the discriminatory environment in which Bunton found himself. Fed. R. Evid. 801(c)(2). The City also disputes the assertion on the ground that Wayne Brooks, the Deputy Chief of Police, stated that he never heard any officer use the word "nigger." (Dkt. No. 49 ("Def.'s Resp. Pl.'s SMF") ¶¶ 17-18.) Brooks's failure to hear any officer use the word is not evidence that Gort did not use the word outside of Brooks's presence.

instead put his car keys in his pocket and leaned backward against the car door. (*Id.*) Lynch then said, "Man, I'm standing here dude."[2] (Pl.'s SMF ¶ 42.) Bunton then told Lynch that he was under arrest and ordered him to put his hands behind his back. Lynch then said "I'm not under arrest" and raised his hands. (*Id.*) Bunton responded by deploying his taser, causing Lynch to fall to the ground. (*Id.*) Bunton discharged the taser multiple times giving Lynch successive electrical charges for a total of seventeen seconds, more than three times the normal discharge. (Def.'s SMF ¶ 15.)

In response to the Lynch incident, Larry Booth, the Chief of the Zion Police Department, filed charges against Bunton on February 15, 2010, with the City of Zion Board of Fire and Police Commissioners (the "Board"), seeking Bunton's termination.[3] (Def.'s SMF ¶¶ 11, 17.) Both Deputy Chief Wayne Brooks and Lieutenant Kirk Henderson recommended that Booth file the charges seeking Bunton's termination. (Pl.'s SMF ¶ 27.) Booth explained that he decided to seek Bunton's termination because of Bunton's disciplinary record, which included another violation for improper use of force at a Walmart six months previously. (Def.'s SMF ¶ 17.) In that incident of May 25, 2009, which was caught on the store's video, Bunton and his partner responded to a complaint that an individual had passed out in the vestibule at the Zion Walmart. (Pl.'s SMF ¶ 35; *see also* Dkt. No. 35, Ex. H.) After several minutes of speaking to the individual, Bunton began escorting the individual off of the premises. The individual pulled his arm away from Bunton several times,

---

[2] The City disputes that Lynch said anything and instead contends that Lynch "was doing nothing else other than leaning against his car." (Def.'s Resp. Pl.'s SMF ¶ 42; Def.'s SMF ¶ 15.) The City does not support its contention, however, and in any case the video of the incident plainly shows Lynch making the comments to Bunton. (Dkt. No. 35, Ex. I, at 14:28:15-28.)

[3] In certain municipalities in Illinois, including the City of Zion, police officers cannot be discharged or punished by a suspension greater than five days except upon written charges and a hearing before the Board, a three member entity appointed by the mayor with the consent of the city council. *See* 65 ILCS 5/10-2.1-1, 10-2.1-17.

swinging it backward away from Bunton and once trying to swing at Bunton.[4] (Pl.'s SMF ¶ 37.) In response Bunton forcibly pushed the individual to the ground. (*Id.*) The individual was unable to break his fall and so hit his head on the sidewalk, drawing blood. (*Id.*; Def.'s SMF ¶ 9.) Bunton received a five-day suspension for his actions. (Def.'s SMF ¶ 8.)

After a full evidentiary hearing held intermittently from March 2, 2010, until September 1, 2010, the Board unanimously voted Bunton guilty of the charges related to the Lynch incident. (*Id.* ¶ 19.) The Board then voted two to one in favor of terminating Bunton. (*Id.*) Bunton appealed the decision of the Board to the Circuit Court of Lake County, which affirmed the decision.[5] (Def.'s SMF ¶¶ 21, 22.)

---

[4] The City disputes that the individual was resisting Bunton, and instead characterizes the individual's actions as "pull[ing] slightly from Ofc. Bunton's grip on his elbow." (Def.'s Resp. Pl.'s SMF ¶ 37; Def.'s SMF ¶ 9.) The City does not support its characterization, however, and the court must view the facts in the light most favorable to Bunton, the non-moving party. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). Thus, after viewing the video labeled "exit2," the court determines that the video supports Bunton's contention that the individual repeatedly tried to pull away from Bunton and at least once tried to swing at Bunton. (Dkt. No. 35, Ex. H, at 3:19:30-20:10.)

[5] Although neither party addresses the issue, the existence of the Circuit Court's decision raises the possibility that the *Rooker-Feldman* doctrine deprives this court of subject matter jurisdiction, an issue that the court must raise *sua sponte*. *See Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 646 (7th Cir. 2011) ("The district court correctly considered the *Rooker-Feldman* doctrine *sua sponte* . . . ."). The court agrees with Judge Gottschall's reasoning in a recent case that when a state court affirms a state or local government employee's termination, a Title VII case alleging that the termination was motivated by discrimination does not implicate the *Rooker-Feldman* doctrine when "[n]o state court ever addressed any issue relating to discrimination or retaliation" and when the state court's decision was "limited to determining whether the [state or municipal] agency's findings of fact were contrary to the manifest weight of the evidence or provided a sufficient basis for a cause discharge." *Dookeran v. Cnty. of Cook*, 11 C 2802, 2011 WL 3876958, at *4 (N.D. Ill. Aug. 26, 2011). Here, the state court's review was deferential to the Board and it did not address any issue relating to racial discrimination, as shown by its decision to affirm the Board's exclusion of evidence of racially disparate treatment because it was "not relevant to these proceedings." (Dkt. No. 35, Ex. G, at 10.) Accordingly, the *Rooker-Feldman* doctrine does not apply.

LEGAL STANDARD

A grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). When ruling on a motion for summary judgment, the court must consider the facts before it in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). The court does not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

ANALYSIS

The City has moved for summary judgment on Bunton's claims that the City terminated him because he is black and created a hostile work environment for him as a black employee. In addition, the City contends that it is entitled to summary judgment on Bunton's claim of retaliation. The court will address each argument in turn.

I. Termination

Title VII forbids "an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may avoid summary judgment in either of two ways. First, he may present "direct or circumstantial evidence that could permit a reasonable jury to conclude that the employer acted with discriminatory intent, often called the 'direct' method of proof." *Brewer v. Bd. of Trustees of Univ. of Ill.*, 479 F.3d 908,

915 (7th Cir. 2007). Alternatively, the plaintiff may use the burden-shifting method of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the "indirect" method. *Brewer*, 479 F.3d at 915. Bunton does not attempt to proceed under the direct method, so the court will consider only the indirect method.

Under the indirect method, Bunton bears the burden of establishing a prima facie case of discrimination by showing that (1) he was a member of a protected class, (2) he was qualified for his position at the Zion Police Department and met the Department's legitimate expectations, (3) he suffered an adverse employment action (that is, an unfavorable material change in the terms, conditions, or privileges of his employment), and (4) similarly-situated non-class members were treated more favorably than he. *Id.* If Bunton succeeds in that showing, "a presumption of discrimination is raised, and the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its action." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). "If the employer meets this burden, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual." *Id.*

This case varies from the typical employment discrimination case in that Bunton does not allege that the person or entity who ultimately decided to terminate him, in this case, the Board of Fire and Police Commissioners, acted because of racial discrimination. Moreover, the City employees to whom Bunton does ascribe discriminatory animus, Booth, Brooks, and Henderson, lacked the authority to terminate him under 65 ILCS 5/10-2.1-17. Those facts would normally be fatal to Bunton's case unless he could show that Booth, Brooks, or Henderson "by concealing relevant information from the [Board] or feeding false information to [it], [were] able to influence the decision." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997). Bunton does

not attempt to make that showing.

Nonetheless, the City does not point out that deficiency, and it is plain from the briefing that both parties considered Booth's decision to file charges with the Board, rather than the Board's termination decision, to be the adverse action that makes the City liable for Bunton's termination. It is unclear whether a decision to file charges under 65 ILCS 5/10-2.1-17 is an "adverse action" sufficient to make out a prima facie case under the *McDonnell-Douglas* framework. *Cf. Bradford v. Vill. of Lombard*, 11 C 00037, 2012 WL 1655966, at *2 (N.D. Ill. May 10, 2012) (declining to reach the defendant's argument in a retaliation case under the Fair Labor Standards Act that the "decision to file charges . . . with the Board does not constitute an adverse employment action because the terms and conditions of [the plaintiff]'s employment remained unchanged at the time the charges were filed"). The City does not dispute that Bunton suffered an adverse action, however, so any argument to that effect is waived. The court will thus assume, without deciding, that Booth's decision to file charges with the Board seeking Bunton's termination was an adverse employment action against Bunton.

Accordingly, the court will proceed to address the only argument that the City does raise with respect to the prima facie case: that Bunton cannot present any evidence of similarly situated non-black employees who were treated more favorably. To succeed in showing that employees are similarly situated for purposes of the *McDonnell Douglas* framework, Bunton's evidence must "establish that the defendants extended leniency to similarly situated white employees who engaged in similar conduct." *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011). The "analysis requires a flexible, common-sense inquiry that asks whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that

the different treatment was a result of race or some other unlawful basis." *Id.* (citations and quotation marks omitted). In a case involving allegations of discriminatory discipline, "[a] similarly situated employee need not be identical, but the plaintiff must show that the other employee dealt with the same supervisor, was subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008) (citations, alterations, and quotation marks omitted).

Bunton identifies three white employees who he contends were similarly situated, and yet received less severe discipline than he did. The first is Officer Joseph Richardt, a Zion police officer who was also disciplined for improper use of force when he used his taser against a subject on July 1, 2008. In that incident, Richardt had pulled over a woman for playing her stereo too loudly. (Def.'s SMF ¶ 37.) After determining that the woman had no insurance, Richardt and Officer Cabalquinto, who was assisting, told her that she should get out of the car, that she was receiving two citations, and that her vehicle would be towed. (*Id.*) The woman then became verbally aggressive, repeatedly told the officers they could not tow her car, and approached Richardt as he was searching her vehicle. (*Id.*) Richardt then placed her under arrest, but the woman became physically resistant as Richardt and Cabalquinto attempted to put her into handcuffs. (*Id.*) After the woman was in handcuffs, she continued to struggle against the officers as they walked her to the squad car. (*Id.*) Richardt then used the taser against the woman, after which she walked to the squad car voluntarily. (*Id.*) Richardt received a written reprimand from Booth for using the taser on the woman when she was already handcuffed. (*Id.*; *see also* Dkt. No. 44, Ex. 6, at 73:20-22.)

Bunton argues that Richardt's behavior was similar to his decision to use his taser on Lynch,

-8-

but that the decision to seek his termination was much stricter than Richardt's written reprimand. Even assuming that Richardt's infraction was just as serious as Bunton's,[6] however, Bunton and Richardt had significantly different disciplinary histories. Before Richardt's reprimand, Richardt had not received any prior discipline. (Def.'s SMF ¶ 38.) By comparison, prior to his termination Bunton had been disciplined at least nine times, including the five-day suspension for the Walmart incident, four other suspensions, and four written reprimands.[7] (Pl.'s SMF ¶ 22.) In particular, Booth noted that he sought Bunton's termination because the Lynch incident was "the second of two serious use of force incidents within six months time." (Dkt. No. 35, Ex. D ¶ 6.) In the context of determining if two employees are similarly situated, the Seventh Circuit has established that "employers are justified in reprimanding employees more severely for repeated errors." *Atanus v. Perry*, 520 F.3d 662, 675 (7th Cir. 2008). Accordingly, Richardt's and Bunton's different disciplinary histories mean they are not similarly situated.

Bunton also contends that Officer Derek Zouladek and Sergeant Alan Lother, two other Zion police officers, received less discipline for a similar incident that occurred on January 17, 2007. On that date, Zouladek and Lother were pursuing a car driven by a suspect reported to have engaged in

---

[6] An obvious difference between the two incidents is that the woman against whom Richardt used the taser was actively and physically resisting the officers, while the court believes after viewing the video of the incident that Lynch had not made any indication that he was going to actively and physically resist Bunton. (Dkt. No. 35, Ex. I.) Lynch had expressed verbal resistance, but was merely leaning back against his car when Bunton used the taser. Nonetheless, viewing the evidence in the light most favorable to Bunton, the court will assume that the severity of the two incidents is comparable.

[7] Although Bunton does not make the argument in the argument section of his response (Dkt. No. 45, at 14-19), his recitation of the facts attempts to downplay the seriousness of Bunton's disciplinary infractions, thereby suggesting that the imposition of the prior discipline against Bunton was also motivated by racial animus. (*See id.* at 5.) Bunton has not, however, presented any evidence that his prior discipline was motivated by his race, so his argument fails.

a battery. (Def.'s SMF ¶ 34(b).) After a lengthy car chase, the suspect finally pulled over, but refused to obey the officers' orders to exit the vehicle. (*Id.*) Instead, the suspect revved the engine, suggesting he would attempt to flee, and attempted to eat marijuana that was in his car. Zouladek and Lother, along with other officers who arrived on the scene, eventually broke the vehicle's window and pulled the suspect out of the vehicle. (*Id.*) The suspect continued to resist officers' attempts to put him in handcuffs. During the struggle, Lother delivered knee strikes to the suspects' upper back, neck, and head, and Zouladek repeatedly hit the suspect's head with his hand. (*Id.*)

As a result of the incident, Doug Malcolm, who was Chief at the time, determined that the officers' use of force was inappropriate and decided to file charges with the Board seeking the termination of both Lother and Zouladek. (*Id.*) While the charges were pending, Booth replaced Malcolm as Chief. (*Id.*) Booth reviewed the charges, decided termination was not warranted, and settled the charges with the officers. (*Id.*) Under the settlement, Lother received a 24-day suspension, and Zouldek received an 18-day suspension. (*Id.*)

Once again, however, even assuming that Bunton's misconduct in the Lynch incident was of comparable severity to the misconduct of Lother and Zouldaek,[8] the disciplinary histories of the officers are too disparate to render them similarly situated. Zouladek, unlike Bunton, had received no discipline prior to the January 17, 2007, incident. (*Id.* ¶ 36.) Lother had some discipline on his record, but not enough to make him comparable to Bunton. Specifically, Lother had been disciplined for one incident on June 9, 2002, in which he traded insults with a driver he had pulled over.

---

[8] Again, that assumption is doubtful because the suspect Lother and Zouladek arrested had actively and physically resisted the police officers, while the court believes that Lynch did not physically resist Bunton. Nonetheless, the court will make this assumption because of its obligation to view the evidence in the light most favorable to Bunton.

(*Id.* ¶ 34(a).) The insults escalated into a physical altercation in which Lother shoved, punched, and kicked the driver. (*Id.*) Lother recommended himself for discipline and received a three-day suspension. (*Id.*) Lother had received no other suspensions or written reprimands, in comparison to Bunton's five suspensions and four written reprimands. (*See Id.* ¶ 35; Pl.'s SMF ¶¶ 58, 62-66.)

Lother had also received a verbal warning or "counseling" for five other incidents (Def.'s SMF ¶ 35), which were less severe discipline than a written reprimand or suspension. In addition, two citizen complaints had been filed against Lother for improper use of force, although one was determined to be "unfounded" (Pl.'s SMF ¶ 62), (meaning that the investigation found that the alleged acts did not occur (Dkt. No. 35, Ex. K)), and one was determined to be not sustained (meaning that the evidence failed to prove or disprove the allegation) (Pl.'s SMF ¶ 66). A third citizen complaint against Lother for "acting beyond the scope of his duties" had been "sustained in part," but Bunton does not present any evidence about the discipline Lother received for that incident.[9] (Pl.'s SMF ¶ 58; *see also* Def.'s Resp. Pl.'s SMF ¶ 58.)

Based on the evidence Bunton has produced, even considered in the light most favorable to Bunton, none of Lother's disciplinary incidents suggest a severity comparable to Bunton's five suspensions and four written reprimands. Like Bunton, Lother had a previous suspension for the improper use of force, but there were almost five years between Lother's two incidents. Bunton's Walmart incident, by contrast, had occurred only six months before the Lynch incident, suggesting both that Bunton's disciplinary problems were more frequent and that Bunton was not responding

---

[9] Bunton also presents evidence of further disciplinary actions against Lother following the incident on January 17, 2007. (Dkt. No. 45, at 10-12.) Those actions, however, are not evidence that Lother following the January 17, 2007, incident was similarly situated to Bunton following the Lynch incident, which is the only relevant comparison for purposes of creating an inference that the City's response to Bunton after the Lynch incident was motivated by racial discrimination.

to the discipline he had received by improving his behavior. Moreover, Bunton had significantly more suspensions and written reprimands than Lother, giving Booth sufficient reason to seek Bunton's termination, but to seek only a lengthy suspension for Lother.

In a final attempt to meet his burden, Bunton argues that the City kept better records of Bunton's disciplinary infractions than it did of the other officers. (Dkt. No. 45, at 17.) The only evidence he offers in support of his argument is that the unfounded and unsustained citizen complaints against Lother were not listed in Lother's performance log. (*Id.*) At least three of the incidents for which Bunton was disciplined, however, along with several unfounded or unsustained complaints against Bunton, are not listed in Bunton's performance log. (Pl.'s SMF ¶ 26.) In the absence of any other evidence about the City's record-keeping practices, there is thus no ground to infer that Bunton's disciplinary infractions were catalogued more meticulously than the infractions of others. Accordingly, Bunton has failed to present evidence of similarly situated non-black employees who were treated more favorably than he, so he has not made out a prima facie case of discrimination. The court thus need not proceed to steps two and three of the *McDonnell-Douglas* framework. Summary judgment is granted to the City on Bunton's claim that his termination violated Title VII.

II.     Hostile Work Environment

Bunton's First Amended Complaint alleges that the City is liable under Title VII for creating a hostile work environment for Bunton because of his race (Dkt. No. 8, ¶¶ 9-10), and the City's motion plainly asks for summary judgment on the hostile work environment claim. (Dkt. No. 33, at 6; Dkt. No. 34, at 13-14.) Bunton's response, however, despite running to twenty pages, does not present any legal argument regarding the hostile work environment claim, and explicitly refers only

to his termination and retaliation claims. (*See* Dkt. No. 45, at 1 ("Bunton has asserted claims of race discrimination and retaliation . . . . A detailed review of the facts surely allow [sic], if not require [sic], a finding that Bunton was intentionally discriminated [sic] *at the time his termination was recommended*." (emphasis added)).) Accordingly, the court will consider Bunton to have dropped the hostile work environment claim. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) ("[B]ecause Palmer failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned."); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001) (failure to raise issue in response to summary judgment before district court resulted in waiver); *Laborers' Int'l Union of N. Am. v. Caruso,* 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions." (citations and quotation marks omitted)); *Robyns v. Reliance Std. Life Ins. Co.*, 130 F.3d 1231, 1237 (7th Cir. 1997) ("A party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.").

Even if it were not abandoned, moreover, the evidence does not support Bunton's hostile work environment claim. To avoid summary judgment on that claim, Bunton must present evidence "that the alleged harassment was both subjectively and objectively so severe or pervasive that it altered the conditions of his employment." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). Bunton's evidence of a few casual racist comments that were not even directed at him falls far short of that standard. Bunton does list some other evidence of negative treatment he received in the fact section of his motion (Dkt. No. 45, at 2-3), including being passed over for some awards and being denied the opportunity to participate in training programs or other activities, but

there is no evidence that the negative treatment Bunton allegedly suffered was motivated by racism. *Yancick*, 653 F.3d at 544 ("To support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose."). Moreover, nothing he lists could be classified as "severe or pervasive." The City is entitled to summary judgment on Bunton's hostile work environment claim.

III.     Retaliation

Finally, the City moves for summary judgment on Bunton's claim that he was retaliated against because of his complaints to Deputy Chief Brooks on April 7, 2008.[10] Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. A necessary prerequisite of any claim of retaliation is that the employee engaged in a statutorily protected activity. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). Thus, Bunton's claim can survive summary judgment only if he has presented evidence that his complaint to Brooks was statutorily protected. To satisfy that standard, Bunton must present evidence showing that he "reasonably believed in good faith that the practice []he opposed violated Title VII." *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002). Under that standard, the Supreme Court has held that it is not reasonable to believe that isolated offensive comments violate Title VII. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271

---

[10] Note that Bunton is not alleging that he was fired or retaliated against because he filed the charge with the EEOC that led to this litigation. Bunton's initial charge with the EEOC is stamped February 16, 2010. (Dkt. No. 1, Ex. A.) Booth filed the charges seeking Bunton's termination on February 15, 2010. (Def.'s SMF ¶¶ 11.) Booth's action therefore could not have been motivated by Bunton's EEOC charge, which he would not have been aware of at the time he sought Bunton's termination.

(2001) (holding that a single isolated comment "cannot remotely be considered 'extremely serious,' as our cases require" and that no reasonable person could believe that such a comment violates Title VII). Here, the isolated comments about which Bunton complained, none of which were addressed to him directly, are similarly benign. *See Yancick*, 653 F.3d at 544 ("We will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating."); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840-41 (7th Cir. 2009) ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment."). No reasonable person could believe that the comments gave rise to a Title VII violation. Accordingly, Bunton has not met his burden on summary judgment as to his retaliation claim, and the City's motion will be granted.

## CONCLUSION

For the reasons explained above, the City's motion for summary judgment (Dkt. No. 33) is granted in its entirety on all counts. Judgment is granted in favor of the defendant City of Zion. Civil Case Terminated.

ENTER:

*James F. Holderman*
_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: October 15, 2012